UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                          Plaintiff,                    Docket No. 1:23-cr-00391-JLC

              *v.*

DUSTIN GENCO,

                          Defendant.

**SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT DUSTIN GENCO**

Date of Service:  February 12, 2024          Jim Walden
                                             **WALDEN MACHT & HARAN LLP**
                                             250 Vesey Street, 27th Floor
                                             New York, NY 10281
                                             Tel: (212) 335-2030
                                             jwalden@wmhlaw.com

                                             *Attorney for Dustin Genco*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................5

BACKGROUND ..................................................................................................8

I.     DUSTIN HELPED CREATE A STRONG FAMILY WHEN LIFE DID NOT EQUIP HIM FOR THAT ..................................................................................8

II.    DUSTIN IS AN IMPORTANT MEMBER OF HIS COMMUNITY .......................13

III.   DUSTIN'S CAREER AS A LAW ENFORCEMENT OFFICER ...........................16

     A.    Dustin Was One of The Most Accomplished Drug Enforcement Officers in New York and Beyond.................................................... 18

     B.    Dustin's Career Had Been Three Decades of Unceasing Dedication and Hard Work.................................................................................... 20

     C.    Dustin's Passion and Commitment to the Work Stemmed from His Deep-Rooted Urge to Protect Others.. ............................................. 22

     D.    Dustin Was a Team Player, Who Was Generous, Selfless, and Never Shy about Offering His Support....................................................... 23

     E.    Dustin Always Conducted Himself with Professionalism and Integrity ......... 25

     F.    Dustin Is Beloved Because of His Humble and Humorous Personality.......... 27

IV.   THE ARREST AT ISSUE AND THE FORCE USED ...............................................28

SENTENCING ANALYSIS....................................................................................32

I.     STIPULATED GUIDELINES SENTENCE ..............................................................33

II.    DUSTIN'S ABERRANT BEHAVIOR WARRANTS A SENTENCE OUTSIDE THE STIPULATED GUIDELINES RANGE..........................................34

III.   § 3553(a) FACTORS COUNSEL FOR A DOWNWARD VARIANCE .................35

     A.    § 3553(a)(1): Nature and Circumstances of the Offense ................................ 36

     B.    § 3553(a)(1): History and Characteristics of Dustin ...................................... 37

     C.    § 3553(a)(2): A Noncustodial Sentence Satisfies the Sentencing Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation........................ 39

     D.    § 3553(a)(3): The Kinds of Sentences Available ............................................ 42

     E.    § 3553(a)(6): A Shorter Sentence is Necessary to Avoid Unwarranted Sentencing Disparities...................................................................................... 44

IV.   DUSTIN ACCEPTS RESPONSIBILITY AND IS IMMENSELY
      REMORSEFUL FOR HIS ACTIONS ........................................................................48

CONCLUSION.............................................................................................................................49

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Castilla v. City of New York*,
2012 WL 5510910 (S.D.N.Y. 2012)...................................................... 47

*Gall v. United States*,
552 U.S. 38 (2007)............................................................ 33, 35

*Pepper v. United States*,
562 U.S. 476 (2011)................................................................. 5

*Tapia v. United States*,
564 U.S. 319 (2011)............................................................... 39

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006)............................................... 5

*United States v. Borker*,
2019 WL 1790054 (S.D.N.Y.2019).............................................. 34

*United States v. Byors*,
586 F.3d 222 (2d Cir. 2009).................................................... 34

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008).................................................... 32

*United States v. Chin Chong*,
No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014)............................ 40

*United States v. Collado*,
No. 07-CR-1144, 2008 WL 2329275 (S.D.N.Y. June 5, 2008)............................. 42

*United States v. Cusack*,
66 F. Supp. 2d 493 (S.D.N.Y. 1999)............................................. 34

*United States v. Davis*,
2008 WL 2329290 (S.D.N.Y. June 5, 2008) ...................................... 38

*United States v. Gonzalez*,
281 F.3d 38 (2d Cir. 2002)..................................................... 34

*United States v. Hawkins*,
380 F. Supp. 2d 143 (E.D.N.Y 2005) ........................................... 41

*United States v. Kaim*,
    2018 WL 10290286 (S.D. Ind. 2018) ................................................. 48

*United States v. Selioutsky*,
    409 F.3d 114 (2d Cir. 2005) ......................................................... 32

*Williams v. New York*,
    337 U.S. 241 (1949) ................................................................... 5

## **Statutes**

18 U.S.C. § 242 ............................................................................. 46

18 U.S.C. § 3553(a) ........................................................... 8, 32, 33, 35

18 U.S.C. § 3553(a)(1) ............................................................ 36, 37

18 U.S.C. § 3553(a)(2) .................................................................. 39

18 U.S.C. § 3553(a)(3) .................................................................. 42

18 U.S.C. § 3553(a)(4) ........................................................ 32, 33, 36

18 U.S.C. § 3553(a)(5) ............................................................ 32, 36

18 U.S.C. § 3553(a)(6) .................................................................. 44

18 U.S.C. §3553(a)(7) .................................................................. 36

U.S.S.G. § 3C1.1 ........................................................................ 34

USSG §5K2.20 ............................................................................ 35

**<u>INTRODUCTION</u>**

At sentencing, the "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). As one court has explained: **"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant**." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (internal quotation omitted).

Dustin Genco is a fifty-two-year-old former law enforcement officer. He served as a First Grade Detective for the New York Police Department ("NYPD") and a federally deputized officer in the Drug Enforcement Administration ("DEA"). Over the course of his long thirty-year career, Dustin stood out as a shining example—for his devotion to public service, his support for his colleagues, his internal standards of excellence, his impressive body of case work, his dogged work ethic, and the sheer volume of the drug networks he broke and the kingpins he brought to justice. Dustin made more than 1,500 arrests in his career, including arresting many violent drug traffickers, without any serious incidents.

Dustin has never fired his weapon in the line of duty, and he has rarely even drawn it from his holster. He has been the lead officer for hundreds of search warrants, including once when he broke down only to find a suspect pointing a loaded gun at him (he disarmed and arrested him). He faced many instances of resisting offenders and he never seriously injured one. He has had suspects punch him, tackle him, knock him down, shoot at him—and he kept his calm each time.

Once a suspect dragged him down a public street while trying to flee in a car, and he still kept his cool. Many other officers could not say this. As the New York Times reported, "[t]o some [officers], drawing their guns, even with no present threat, is routine, a practice borne of habit or some internal gauge of an encounter that might go bad. And their bosses, unlike some police commanders around the country, permit it."[1] This has never been true of Dustin.

Balanced against a career, where he always sought to administer justice through principles of de-escalation and restraint, and where he nonetheless delivered superlative results for the communities he served, Dustin committed an offense that ended his career in shame. He is deeply remorseful for his misdeed. When balancing the exemplary nature of his career against the nature and circumstances of his offense, the U.S. Probation Office correctly concluded that a non-incarceratory sentence is appropriate. We hope the Court agrees.

The circumstances of Dustin's offense, for which he accepted responsibility, are not in dispute. On October 20, 2022, Dustin was assigned to a fugitive task force detail at an apartment in the Bronx. The suspect, Frandi Ledema, was a prolific fentanyl dealer, who absconded after a prior arrest and continued to distribute fentanyl from the apartment he shared with his girlfriend and her ten-year-old son. When task force members tried to arrest him at that apartment, Ledema fled out of a six-story window.

Dustin was assigned to a short-staffed detail covering the back of the apartment building. He saw Ledema trying to escape down a fire escape. He acted with bravery, taking the lead to capture Ledema while his partner, Claudia Salvitti, waited below. Alone, Dustin climbed the stairs and approached Ledema from a position of vulnerability—standing several feet below Ledema on

[1] Al Baker, *For New York City Officers, Drawing Guns Is Based on Discretion, Not Rules,* The New York Times (November 25, 2014), https://www.nytimes.com/2014/11/26/nyregion/for-new-york-city-officers-drawing-guns-is-based-on-discretion-not-rules.html.

the stairs with his back against the railing. Dustin drew no firearm. He brandished no weapon. He tried to calmly persuade Ledema to surrender peacefully.

In a surprise attack, Ledema hurdled his body at Dustin, almost knocking Dustin over the railing. Ledema then collided with Officer Salvitti, who had started to ascend the fire escape, as he fled. Dustin collected himself and gave chase. He caught up to Ledema, and the two men fought. When Officer Salvitti tried to intercede, Ledema hit her so hard it knocked her across the alley. After a long scuffle, Dustin finally pinned Ledema on the ground. Salvitti regained her footing and cuffed Ledema—who was still wriggling to escape—while Dustin kept Ledema pinned on the ground. Subdued, Ledema was seated on the ground with his hands cuffed behind his back.

Dustin walked away to retrieve his radio, which fell from his utility belt during the melee. Still frustrated and angry, Dustin returned to Ledema and kicked him once in the chest. However hard Dustin kicked, it left no visible mark on Ledema, nor did it knock Ledema over. Ledema refused to seek any medical treatment. When Ledema was examined at a hospital for other scrapes from the melee on the same day, he complained of no injury or pain to his chest.

In the days that followed, Dustin justified the kick to his colleagues and his boss, saying words to the effect that Ledema was still resisting at the time of the kick. A review of the video of the incident shows that, whatever was in Dustin's head, Ledema's efforts to escape had ended at the instant of the kick. Dustin now realizes that the kick was borne of frustration and anger. He had never before encountered an arrest like this, and he had his worst moment—he illegally struck a defenseless arrestee in anger.

Dustin pled guilty, resigned from law enforcement, and is now facing sentencing as a convicted person. For the reasons set forth below, we urge the Court to place his offense within

the context of the heroic actions he took throughout his professional career and sentence Dustin based on a simple truth: Dustin's use of excessive force was an aberrant act, wholly out of character. Given the consequences he has already endured, none of the factors listed in 18 U.S.C. § 3553(a) merit a jail sentence. We hope the Court sees that, literally, Dustin is being sentenced based on his worst moment, after a distinguished thirty-year career of protecting the public, where his conduct has been hailed—by nearly 100 diverse law enforcement colleagues, from all walks of life, and who knew Dustin at different stages of his career—as heroic. With this context, and based on all the factors outlined below, the Court should not imprison Dustin.

## BACKGROUND

### I. DUSTIN HELPED CREATE A STRONG FAMILY WHEN LIFE DID NOT EQUIP HIM FOR THAT

Dustin was born in 1972 to Joanne Maracia and Frederick Eggers. Joanne was a clerical worker for a Long Island freight company. Frederick abandoned Dustin when he was one year old. All Dustin learned about Frederick was that he used drugs and was abusive to Joanne.

When Dustin was about six or seven years old, Dustin's mother remarried, this time to Robert Genco. Robert was a respected police officer. The family included a maternal half-brother, who was thirteen years younger than Dustin (from the union of Joanne and Robert; Dustin also has a paternal half-brother, Frederick, who Dustin met only as an adult). The family resided in Valley Stream, New York, where Dustin finally had a stable home. Aside from his parents arguing, Dustin was grateful to finally have some peace. What he lacked was meaningful attention or affection. There were no real bounds of closeness. When Dustin left the home, there was little to keep familial bonds intact. To date, Dustin does not have any meaningful relationship with his family.

Fortunately for Dustin, he found true love with Frances ("Fran") Genco. When they met in 1992, Fran was in high school, and Dustin had recently graduated. The two have been

inseparable since. They basically "grow up together," as Fran's sister puts it, "and have such an amazing marriage that [she has] always admired." Ex. 018, Carlino-Baer. Andrea Avallone, a close family friend, describes their marriage as one bonded by trust, communication, respect, and "playfulness and friendship," and admires them as a couple that can "finish each other's sentences and give one another undivided attention." Ex. 007, Avallone. They have been together for thirty-two years, twenty-two of which they lived in the same home in Seaford, New York. They raised two children together and named them Francesca Genco and Dustin Genco, both of whom are attending college.

Two years after Dustin and Fran met, Dustin entered the NYPD Police Academy. It had been his dream all along. Among other reasons, he watched so many of his friends and people in the community suffering at the hands of drug addiction and violence; he pledged to make a difference and to devote himself to the battles with drugs that were tearing down his neighborhood. *See* Ex. 045, Glover. He worked hard to earn the opportunity—Fran's mother proudly recalls Dustin staying up late in her basement for hours studying penal law, with Fran next to him studying to become a teacher. *See* Ex. 042, Fran Genco, Ex. 017, Carlino. When Dustin was finally sworn in to become one of New York's Finest, Fran was filled with pride, but she also knew the days to come would not be easy. *See* Ex. 042, Fran Genco.

She was not wrong. They were married in 1998. They had their first child in the spring of 2001. A few months later, New York was targeted in the 9/11 attack. *See id.* Dustin threw himself into the rescue operations, coming home every night with "soot on his clothes and in the bathtub," suffering from constant "coughing and congestion," and missed many "firsts" of his daughter's. *Id.* Fran's sister Gabriella remembers calling Fran immediately after the attack and found Fran "in tears caring for her 3-month-old baby girl when [Dustin] ran out the door to go

into the city." Ex. 018, Carlino-Baer. Ms. Avallone (referenced above) remembers that in those days, "Dustin was at ground zero for days at a time," and Fran would spend "many nights alone wondering when Dustin would return home," and would "help him get out of his clothes" and "[s]tart a shower for him" when he finally got home. Ex. 007, Avallone. Dustin would spend the precious off time "hold[ing] his daughter and speak[ing] to his wife about how her day or week was," and "didn't want to speak about what he had witnessed." *Id.*

And it was not just the duties of being a first responder to unprecedented crisis that was hard for Dustin's family, but also the daily grind of being a law enforcement officer—the long hours and late nights, the 2 a.m. search warrants, the never-ending surveillance, and the constant fear of never knowing if Dustin would be coming home safe—"a fear only families of law enforcement can understand." Ex. 043, Francesca Genco; *see* Ex. 042, Fran Genco.

Despite the extreme pressures of his job, Dustin remains a devoted husband and father, striving to create the kind of family life he lacked as a child, always finding time to be present for them and creating precious memories together. Fran's sister Gabriella recalls that Dustin "never missed anything important for his children," and "always made sure to be at every baseball game, cheerleading event, or any event at school, [u]sually coming straight from work on little to no sleep but you would never know because he always has a smile on his face." Ex. 018, Carlino-Baer. Dustin has always put his family first, including by willingly devoting his time to the sometimes tedious and less glamorous chores:

> No matter how many hours he worked in a week including overtime and the lack of sleep he had…He would come home from a long day/night and do a variety of chores around the house. He would wash all the cars. Clean the garage. Mow the lawn. Power wash the house. Complete home improvements or projects he had started but never got to finish. He would clean. Cook…After all this, he would finally sit down and have dinner with his family.

Ex. 007, Avallone.

Dustin's daughter still fondly remembers those nights when Dustin came home from a late-night shift with takeouts from Taco Bell, and the family would all wake up and have their second dinner together. *See* Ex. 043, Francesca Genco. To Dustin's son, he is not only a parent but also a "best friend, mentor, role model, and hero." Ex. 041, Dustin Genco (Jr.). With his son, Dustin could finally build the kind of relationship he wished he had with his own father but was never given the opportunity. *See* Ex. 042, Fran Genco. The letter of support from Dustin's son is filled with endearment and respect:

> I have never encountered anyone with such dedication and determination…He would often return home after I had already gone to bed, only to rise early the next morning and head back to work. Regardless of the time, my father would always take a moment to come into my room, kiss me on the head, and wish me goodnight or good morning…Despite his demanding work schedule, my father always made time for me…I remember him driving us to Florida for my soccer tournament. It took 18 hours. When we finally arrived, he exited the car, threw his back out and had difficulty walking for several days. It didn't stop him from coming to any of my games at the tournament, cheering me on and making it a fun, memorable experience. We still always get a good laugh about it.

Ex. 041, Dustin Genco (Jr.).

To his wife, Dustin has been her rock through all the ups-and-downs over the years. Fran describes how Dustin supported her when she had a dangerous and devastating miscarriage:

> I became pregnant a year after we were married, and we've never been more excited in our lives. Unfortunately, I lost the baby and almost lost my life. The doctor said it was a miracle I survived. During that time, I was so devastated that I almost wished I hadn't lived. It was my husband that would hold me as I cried for hours…would pick me up off the floor when I just wanted to lay there…and would just sit with me in silence when I had nothing left. He never left my side and was patient with me. I knew he was hurting too but always made sure I was ok.

Ex. 042, Fran Genco.

What Dustin lacked from his own parents, he finally found in Fran's extended, loving family, who took Dustin in and gave him support. Dustin returned that support with unconditioned love, and quickly became an integral member of this close-knit family. Fran's little sister Gabriella

first met Dustin when she was four years old on the day of Fran's prom and has known Dustin "almost [her] entire life." Ex. 018, Carlino-Baer. To Gabriella, "Dustin is not just [her] brother-in-law," but "a brother, father figure, someone [she would] go to for advice and pretty much anything [she] needs help with." *Id.* She remembers that shortly after meeting Dustin, he "instantly became part of [the] family," and years later, walked Gabriella down the aisle when she got married, and then became her newborn's godfather:

> Dustin also had an amazing relationship with my parents, especially my father. They did everything together. Fishing on our boat or hunting upstate for the weekends. They developed such a special bond and loved each other like father and son. In 2015 my father passed away and it devastated my entire family…. When I got engaged, it was a bittersweet moment knowing my father would not be there to walk me down the aisle. I knew I would ask Dustin to do the honor …Moments before Dustin walked me down the aisle, we both had tears in our eyes. We had a special moment knowing that we both wished my father could have been there. But having Dustin with me was comforting knowing that my father would have been so proud that he was the one walking me down the aisle and he wouldn't have wanted it any other way.

Ex. 018, Carlino Baer.

Dustin is also extremely important to Fran's disabled sister, Maria, who suffers from a traumatic brain injury. Dustin loves Maria like his own sister and, according to her sister Gabriella, became Maria's "favorite person in [the] family." Ex. 018, Carlino-Baer. According to family friend Andrea Avallone, "[w]hen Maria sees Dustin, a big smile comes across her face." Ex. 007, Avallone. Although Fran's mother, Francesca Carlino, currently cares for Maria full-time, that responsibility will fall to Fran and Dustin when Francesca inevitably cannot—a notion that gives Francesca comfort. In her letter of support, Francesca describes Dustin and Fran as "two of the kindest people" she knows, and writes about the important and close relationship shared by Dustin and Maria:

> He makes her laugh and always makes sure she has everything she needs. Whether it be a pair of new sneakers or a winter coat. She would also grab her piggy bank knowing he always puts in a few dollars. This always gives us a

good laugh.  [Maria] absolutely adores him.  Anyone who has a special needs child understands when a person is genuine, and the affection is real…Without ever bringing this up with Dustin, he mentioned in a conversation that I never need to worry about Maria.  He said he would take care of all my daughters, including Maria.  From that moment on, he was no longer my son-in-law but my son.

Ex. 017, Carlino.

Dustin is the backbone of the family, but he does not take himself too seriously.  His friend Andrea Avallone describes Dustin as someone with "a dynamite sense of humor," Ex. 007, Avallone, and his sister-in-law believes Dustin "may be one of the funniest people [she] knows." Ex. 018, Carlino-Baer.  To this day, Dustin would still address up as Santa or the Easter bunny with his two adult children, which would always make the family "laugh[] hysterically with each other." *Id.*

## II.    DUSTIN IS AN IMPORTANT MEMBER OF HIS COMMUNITY

Dustin also made a strong impact on his community through his acts of kindness and, at times, bravery.

Fran knows better than anyone that her husband is "a good man with a good heart," and is the kind of person who would "help[] people cutting down trees, snow-blow[] practically the whole neighborhood, pick[] up the kids and their friends from all different places and at all hours of the night." Ex. 042, Fran Genco.  He is the go-to person fixing flat tires not just for his own children but for all of their friends.  *See* Ex. 43, Francesca Genco.

Dustin's valor was put to the test in 2004 when he accompanied his kids to a water park. There, on a river ride, a disabled person fell into the water.  While other bystanders stared in disbelief, Dustin reacted immediately, diving in and pulling the man out of the water.  *See* Ex. 042, Fran Genco.  Dustin immediately went back to his family as if nothing had happened.

Kevin Andersen, who lives in the same neighborhood and has known Dustin for over fifteen years, writes that "Dustin has always been a friend to be depended on, regardless of the situation," and "has proven time and again to be a reliable friend who would drop anything for friends and family." Ex. 002, Andersen. Kevin still remembers that when he was hospitalized for surgery in 2012, Dustin and Fran happily offered to watch their three children so his wife could be by his side. *Id.*

Dustin's friend Jessica Mannino, who grew up in the same block as him, always tells others that Dustin is "the most loyal, kind, giving human being [she has] ever met," and describes how Dustin has been taking care of her "like a brother":

> We live further from each other now, but when I went through my divorce, Dustin was the one who stopped by to fix things, help with landscaping, snow removal, etc. as he knew I was alone raising my young children at the time. He's the first one to say, "I can help", "I'll run over my generator Jess while you guys get through the storm" (when he lives 35 – 40 mins away). He literally recently drove over his large heavy generator to our house and set it up so we can have power this past January.

Ex. 063, Mannino.

Dustin not only always gladly extends a helping hand, but also knows how to do it in his own compassionate and light-hearted way that genuinely comforts people who are going through a hard time. Dustin's friend Andrea Avallone remembers the time when Dustin held her hand through a stressful medical procedure:

> There was one time when I was anxious and nervous about an upcoming medical procedure. I had to be put to sleep and had no way of getting to my appointment. My husband was recovering from knee surgery and couldn't drive me. Dustin offered to take me. He made me laugh and reassured me I was going to be okay. The day of my procedure, Dustin explained to the doctor how anxious and nervous I had been. He stated he was my "Fill in Husband" and had everyone, including me, laughing. Dustin waited for me in recovery. He made all the necessary calls to my family and friends. He went above and beyond to make a stressful day go as smooth as possible.

Ex. 007, Avallone.

Dustin is also a dedicated volunteer coach for a little league team called Levittown North Baseball. The manager of the team, Edward Picarella, who met and became friends with Dustin fourteen years ago, writes that when he "approached all the parents from [their] team, Dustin was the one who volunteered without hesitation." Ex. 076, Picarella. After coaching for the first season, Dustin then volunteered as a travel team coach for five years, tirelessly leading the team through their games in the spring, summer, and fall seasons, as well as winter workouts. *See id.* Like how Dustin approaches just about everything, he "went above and beyond" with coaching:

> He was the first to the field the day after a rainstorm to sweep and drag the puddles off the field so the kids could play the scheduled games. At the end of our five-year commitment, we took the kids to Cooperstown for a tournament. The team raised money for this trip, but when the team needed funds, Dustin was the first to donate it to the team.

Ex. 076, Picarella.

It did not matter to Dustin that he often had to travel to games immediately after leaving a police shift, sometimes without even time to shower. Whatever stresses he endured on the job, he left them behind to devote himself fully to the children. Dustin also brings his character and positivity into his coaching. Edward Picarella writes that Dustin "would spend hours a day working with kids and helping them improve their skills, but more importantly, he was always boosting their confidence with constructive advice." Ex. 076, Picarella. Kevin Andersen, whose son played in the little leagues team, believes that "Dustin helped to instill a lifelong love of the sport that led to [his] son playing college baseball." Ex. 002, Andersen. Joseph Mogenis, a former colleague of Dustin at NYPD whose son played on the travel team Dustin coached, "personally witnessed Dustin instill positivity on these young baseball players which created great team chemistry for the players as well as the parents." Ex. 070, Mogenis.

Dustin was not only respected but also loved by the team. Edward Picarella recalls "[t]he kids on the team enjoyed being around Coach Dustin, as he had a way of taking the pressure off

of them with his sense of humor." Ex. 076, Picarella. Dustin's "sense of humor and humility endeared him" to all the kids on the team. Ex. 041, Dustin Genco (Jr.). Dustin's son remembers one incident which shows the kind of love the team had for Dustin: Dustin was known for wearing his white tank tops when coaching so much that it became a running joke, and the entire team once showed up all wearing the same white tank tops to surprise him, and they all had a good laugh. *See id.* The team, all in matching white tank tops, posed for a group photo, which Dustin's son still cherishes to this day. *See id.*

## III. DUSTIN'S CAREER AS A LAW ENFORCEMENT OFFICER

Dustin started his career in 1994 as a patrol officer at NYPD, investigating violent crimes on the streets of Brooklyn. In 1998, he began specializing in narcotic crimes. He spent the first ten years focused on narcotics offenses as a Detective in the Manhattan North Narcotics Division of NYPD. He then became a federally deputized Task Force Officer ("TFO") to DEA, and was assigned to the New York Drug Enforcement Task Force ("NYDETF"), where he spent the bulk of his career.

NYDETF is "not only the oldest but also the most esteemed DEA unit in the nation," and has earned respect throughout New York and global law enforcement circles for bringing to justice the most violent and prolific narcotics offenders.[2] Ex. 036, Donovan. The mission of NYDETF is to "go after some of the most violent criminals who sell deadly substances." Ex. 044, Gibson. Needless to say, only the best of the best can be selected to join NYDETF. Even in this highly prestigious and productive Task Force, Dustin was still one of the top contributors. To list a few examples from publicly available sources, Dustin *led* operations where he and his team: 1) arrested

---

[2] *A Salute to the Oldest and Largest Task Force in the Nation*, United States Drug Enforcement Administration (January 8, 2021), https://www.dea.gov/stories/2021/2021-01/2021-01-08/salute-oldest-and-largest-task-force-nation.

a Colombian drug "kingpin" and his accomplices,[3] 2) seized over fifty-five pounds of heroin and Fentanyl with an estimated street value of $7.5 million,[4] 3) seized Fentanyl that was enough "to kill nearly 2 million people" in one raid;[5] and 4) seized $1 million worth of heroin/Fentanyl where the specific brand was associated with multiple fatal overdoses.[6]

In 2021, Dustin retired from NYPD as a Detective First Grade (the highest grade promoted at the discretion of the Police Commissioner). But he did not step away from the front line of the war on drugs. He brought his expertise and spirit to the Nassau County District Attorney's Office ("Nassau County DA's Office"), a place that is closer to home so he could spend more time with his family. While working in Nassau County, Dustin was cross-designated to DEA, where he continued participating in high-stake investigations and operations. In 2022 alone, Dustin and his team seized $18.5 million in narcotics proceeds. Just weeks before the instant offense (after which Dustin was assigned to desk duty), Dustin busted a heroin mill across from an elementary school in the Bronx[7] and led NYC's largest rainbow Fentanyl seizure in history.[8]

On July 31, 2023, Dustin formally resigned from Nassau County DA's Office pursuant to one of the conditions of his plea, effectively ending his nearly thirty years of service as a law enforcement officer. He is still sorely missed. Dustin's supervisor at Nassau County DA's Office,

[3] Garth Johnston, *Alleged Colombian Heroin Smugglers Busted Thanks To "Draft" E-mails*, Gothamist (March 7, 2013), https://gothamist.com/news/alleged-colombian-heroin-smugglers-busted-thanks-to-draft-e-mails.
[4] *New York Men Arrested After $7.5M Worth of Suspected Heroin and Fentanyl was Seized in Alleged Packaging Mill: Authorities*, NBC New York (July 19, 2018), https://www.nbcnewyork.com/news/local/new-york-men-arrested-after-75m-worth-of-suspected-heroin-and-fentanyl-was-seized-in-alleged-drug-mill-authorities/2085917/.
[5] Marcus Solis, *DEA seizes enough fentanyl 'to kill nearly 2 million people' in one raid*, ABC30 (March 1, 2019), https://abc30.com/drug-bust-westchester-county-fentanyl-mill/5163823/.
[6] *$1M worth of drugs labeled 'coronavirus' bio-hazard, 'Black Mamba' seized by DEA in New York*, ABC11 (May 9, 2020), https://abc11.com/coronavirus-us-heroin-bust-fentanyl-drug/6166376/.
[7] Larry Celona, Ben Kesslen, *Heroin mill across from elementary school busted in the Bronx*, New York Post (August 8, 2022), https://nypost.com/2022/08/08/heroin-mill-across-from-elementary-school-busted-in-nyc/.
[8] Aya Elamroussi, Rob Frehse, *New York City announces its largest rainbow fentanyl seizure in history, eclipsing record bust from last month*, CNN (October 13, 2022), https://www.cnn.com/2022/10/13/us/nyc-fentanyl-seizure-largest/index.html.

Deputy Chief Investigator Richard Hayes, writes that Dustin's departure "was like a death in the office."  Ex. 053, Hayes.

If the Court were looking for the most authoritative characterization of Dustin's impact, it should look to the letter submitted by DEA Chief of Operations Ray Donovan, who called Dustin "a true inspiration of what public service is all about."  Ex. 036, Donovan.  But the stirring letters, and examples, of Dustin's many, many accomplishments and acts of valor are spread across the eighty-eight letters of support from Dustin's former coworkers, supervisors and mentees.  Given the sheer volume of the letters, we do not cite every one of them here.  It is a daunting task to try to select letters that are representative of Dustin's years as a law enforcement officer.  We have done our best below.

### A. Dustin Was One of The Most Accomplished Drug Enforcement Officers in New York and Beyond

Dozens of Dustin's former colleagues praise Dustin, without reservation, as one of best detectives with whom they have ever worked.  To select a few testimonials from the letters:

- **Nicholas Palmeri**—a retired DEA senior executive who had three decades of law enforcement experience, worked with DEA agents throughout the world, became a Supervisory Special Agent in NYDETF in 2009, was last posted as the Reginal Director of North and Central Americas Region of DEA before retirement, and participated in hundreds of prosecutions and investigations in federal and state courts of New York—states that NYDETF is the "largest and most productive Task Force in the world," and is comprised of "the best of" New York State Troopers, NYPD Detectives, and DEA Special Agents; and among them, he "can say with confidence that Dustin Genco is one of the best and most talented Detectives to ever grace the 6th Floor of 99 Tenth Avenue [where NYDETF is located]."  Ex. 074, Palmeri.

- **Richard Turk**, a Senior Investigator with the Office of the Special Narcotics Prosecutor in New York City, who has known Dustin for twenty-five years and had been working closely with Dustin for the past ten years, writes that Dustin was "one of the most successful and recognized Detectives/Investigator in the history of the DEA Task Force," and "was hands down, the best Detective/Investigator [he] ever worked with."  Ex. 095, Turk.

- **Stephen Bryne** worked alongside Dustin at the Nassau County DA's Office after serving thirty years as a Special Agent in the FBI. He has devoted his whole life to fighting the war on drugs—partly because his young brother at NYPD was assassinated by a drug kingpin who ordered that a cop be killed to "send a message"—and has "seen the best and the worst of humanity as well as the best and worst of law enforcement." Ex. 015, Bryne. He considered Dustin to be "one of the best, having committed his life to keeping the communities he serves safe from the ravages of the drug trade." *Id.*

- **Marcel Philippe**, a retired Assistant District Attorney who had known and collaborated with Dustin for over a decade, writes: "In all candor, over my 40 years in the office as a prosecutor, Special Agent Dustin Genco stood out as one of the finest I ever had the privilege to know. He was a legend in law enforcement in our Office that worked large international narcotic and money laundering investigations." Ex. 075, Philippe.

Dustin's achievements are not only reflected in the opinions of these dedicated, career law enforcement professionals, but also from the quantity and scale of operations in which he was involved over the years. People who worked closely with Dustin give important testimonials to Dustin's work in narcotics interdiction:

- **Danielle Dreyer,** who worked as a Special Agent at DEA with Dustin beginning in 2012, writes that Dustin "was respected around the [New York] division [of DEA] as one of the best investigators in the building if not the city, and couldn't seem to go a week without creating a SEAR (Significant Enforcement Activity Reports written as the result of large seizures, several arrests and/or other worthwhile casework)," and was among "a select group of individuals who can claim to have rid the streets of New York of literally hundreds of kilograms of heroin and fentanyl." Ex. 037, Dreyer.

- **Micheal Cassino**, who worked with Dustin in the DEA Task Force for 15 years, writes that "[a]ny time in the past 15 years I saw a front-page news article on a large-scale heroin or fentanyl bust in the tri-state area, I would call Dustin, assuming he was the case agent," and "[t]he vast majority of the time, he was." Ex. 019, Cassino.

- **Brian Rodriguez**, a prosecutor who worked with Dustin for nearly a decade in both Nassau County and the Office of the Special Narcotics Prosecutor, writes that Dustin's quality of work was unmatched by other detectives he had worked with, and their work together had "secured convictions of several individuals transporting multiple kilograms of cocaine, heroin and, fentanyl from Mexico, many of whom themselves were proven to be in direct communication with cartel members, as well as other individuals storing substantial amounts of narcotics." Ex. 081, Rodriguez.

**B.** **Dustin's Career Had Been Three Decades of Unceasing Dedication and Hard Work**

Dustin's achievements were a result of the work he put in, from when he first became a "rookie" police officer at NYPD in 1994 to his post-retirement work in the Nassau County DA's office up till 2022, where he continued to give his all.

Dustin's work ethics already distinguished him when he first graduated from the Police Academy and joined NYPD.  Christopher McDonald, a retired NYPD Lieutenant after thirty-three years of service, was tasked in 1994 with training the latest graduating class of Probationary Police Officers including Dustin; he remembers that "[f]om the start, Officer Genco showed himself to be fully invested in his chosen profession."  Ex. 068, McDonald.  According to him, Dustin was always "proactive"—"[w]hile some officers might attempt to distance themselves from [] [problematic] areas or at the very least be reactive, Officer Genco would place himself squarely in the middle."  *Id*.  James Cronin, another retired NYPD Lieutenant who was Dustin's immediate supervisor in 1999, writes that Dustin "would always volunteer for any tasks required" by the case.  Ex. 026, Cronin.

In 2008, Dustin was selected to be a federally deputized TFO to DEA, and his dedication to the work only grew stronger.  T. Glen Coughlin, who was appointed as the Assistant Special Agent in Charge at NYDETF in 2005, acted as Dustin's second-line supervisor from 2008 till 2017.  *See* Ex. 024, Coughlin.  Part of his job was to report statistics on each team's performance regularly, and he remembers that after Dustin's assignment to Group T-12, Dustin's "leadership and work ethic soon changed the entire [] dynamics" of that Group, which previously had been one of the slower-paced groups in NYDETF.  *Id*.  According to him, normally, "the entire NYDETF would disrupt and dismantle two or three heroin/fentanyl mills on an annual basis," but with Dustin's skills and hard work, Group T-12 alone "began 'hitting' these mills"—i.e., "forcibly

and by surprise enter[ing] the subject heroin mills" that "were the most dangerous drug operations in the New York City"—on a ***monthly*** basis. *Id.*

A large part of the work of a drug enforcement agent is not as "exciting," but it is nonetheless essential for leading to a successful bust; Dustin knew it, and never saw anything as menial work. Eric Tyler, who worked with Dustin at DEA on more than 100 cases, writes that these cases often involved "wiretaps, pen and ping orders, vehicle GPS installs, hours of surveillance, pole camera installs and video review, debriefing informants, and doing countless hours of paperwork and processing evidence." Ex. 096, Tyler. According to Officer Tyler, the "tireless hours" Dustin put into these investigations eventually led to a series of victories, including capturing cartel members laundering millions of dollars and the culprits behind a marijuana grow house explosion that killed a FDNY Battalion Chief and injured more than a dozen police officers and firefighters. Ex. 096, Tyler. Likewise, Robert Van Houten, who supervised Dustin from 2016 to 2020 at DEA, recalls Dustin being the guy "making the unpopular decision to continue the surveillance" when the rest of the team "would just want to call it a day to finally go home" after a long day. Ex. 097, Van Houten. Indeed, Dustin's work never seemed to shut down. William Sommer (another colleague) recalls that—while others were celebrating a Super Bowl—Dustin was reviewing camera footage and located a critical piece of evidence against later-convicted traffickers. *See* Ex. 091, Sommer. Many of the letters attest to this dogged work ethic no matter how menial the task at hand.

This ethos continued well after Dustin could have comfortably retired. Instead, Dustin joined the Nassau County DA's Office as an Investigator in 2021. At this point in his career, he "could have coasted on his past reputation and achievements," but "that is not Dustin Genco's way." Ex. 011, Bernard. Dennis Farrell, the Chief Investigator of Nassau County DA's Office,

describes Dustin as "[a] person who was dedicated, to the best of his ability, to eradicate the source of illegal drugs from our communities," was "motivated and self-disciplined," and was "a no nonsense, no stress subordinate."  Ex. 039, Farrell.

### C. Dustin's Passion and Commitment to the Work Stemmed from His Deep-Rooted Urge to Protect Others.

Dustin was never motivated by awards and accolades.  He was motivated by a higher calling—his desire to protect the community from drugs, drug traffickers, and the collateral violence that usually follows both.

When Dustin was first assigned to DEA, it did not take long for his Chief of Operations, Ray Donovan, to realize that what "set him apart from most law enforcement officers" was that he was motivated not by "the allure of promotions or the accumulation of accolades"; instead, what drove Dustin to put in the hours and eagerly absorb knowledge on investigative techniques were his "genuinely selfless nature, unwavering commitment to public service, and the unyielding willingness to put his own life on the line to save others."  Ex. 036, Donovan.

Dustin's work saved many lives.  Special Agent Chad Assenmacher estimated that Dustin's work resulted in the seizure of "more than one million doses of heroin and fentanyl that were destined for our communities."  Ex. 006, Assenmacher.  From this alone, he knows Dustin's work "saved countless lives," including those of overdose victims.  He saw that—while other agents showed up for the splashy press conferences after big busts—Dustin would rather return to the grindstone to start making the next case on the following, if not the same day.  *See id*.

While the letters recount many large and high-profile interdictions, it is important and rare that Dustin gave the same commitment—and at the same level of quality—no matter how big or small the operation.  For example, DEA Special Agent Alicia Scanlon recalls how Dustin coordinated a well-orchestrated cross-office operation to seize two kilograms of heroin:

I shared and coordinated [information about a heroin supplier in NYC] with Dustin and his team. He immediately began preparing for our arrival and follow on operation tending to the multiple details and coordination required of this complex multicity operational plan. Dustin was completely prepared upon our arrival. He had tirelessly coordinated all of the necessary intelligence while placing significant law enforcement resources on standby in case we needed additional assistance. Together, our team orchestrated a controlled delivery of two kilograms of heroin, resulting in the successful arrest of the source of supply. While two kilograms may not have seemed significant to the agents in New York, Dustin treated it as if it were a thousand kilograms.

Ex. 087, Scanlon.

### D. Dustin Was a Team Player, Who Was Generous, Selfless, and Never Shy about Offering His Support

No matter the context, the attached letters of support paint a flattering picture of Dustin for always putting the mission first and helping colleagues. Even when others were investigating "his" targets, Dustin bucked the normally competitive law-enforcement expectation. Special Agent Matthew Daly spoke directly to this trait:

When [Dustin was investigating a target I was also covering], I immediately assumed he would tell me to back off as he was a senior investigator, and that was a common theme amongst the hierarchy of agents and TFOs in those times…Within a few short minutes, he began to tell me intricate details of the various suspects involved in the investigation. He knew phone numbers, addresses, common areas where the traffickers would meet, and other details that I was still trying to obtain. I immediately thought to myself that he was going to keep the investigation, however, to my surprise, TFO Genco not only told me all of the things he knew, but he also provided all of the evidence…Following the completion of the investigation, TFO Genco reached out and congratulated me on a job well done. This is what makes TFO Genco one of the most respected investigators. His commitment to the mission outweighs his personal ambitions.

Ex. 030, M. Daly.

Dustin's myopic focus on doing his job well equipped him to be an exceptional mentor, another trait featured in the many letters of support. For example, Jugony Rosado, a now retired First Grade Detective from NYPD, is still grateful for how Dustin took him under his tutelage twenty years ago:

I first met Dustin when I was recruited to be an undercover for the Organized Crime Control Bureau, Narcotics Division for Narcotic Borough of Manhattan North. Dustin went out of his way to introduce himself and extend his hand as a mentor and friend in this new world of Policing I was entering. I, as a new member of this elite group, was intimidated, and afraid that I was not prepared or good enough to be around Detectives with distinguishable and reputable reputations with such a vast amount of experience known all over the NYPD. Dustin not only made me comfortable, but he also introduced me to other undercovers who had time and experience in the Organized Crime Control Bureau. Dustin took time to explain what I needed to do, who is worth listening to, and how to be confident by trusting the people I would be working with side by side as a family on an everyday basis.

Ex. 083, Rosado.

It is very important to note that, while many would "help" when the spotlight was shining, Dustin *always* helped, even when no one was looking and even when the task was unpleasant. Although other letters speak to this trait, the letter from John Barry, a former NYPD officer who was also deputized to DEA, is noteworthy:

One of my strongest recollections during that period is Dustin offering to help me process a plethora of documentary evidence from a major cocaine mill in upper Manhattan. Oftentimes, police officers prefer to make arrests and conduct search warrants. Not so many detectives prefer to painstakingly review documents and cross reference small details buried in a mound of paperwork…But Dustin often offered to sit down and take over that task for me…And as always, I knew that he could be depended on to help in whatever manner was required.

Ex. 009, Barry.

As the letters attest, Dustin's mentorship was especially trained on helping women navigate the male-dominated culture of law enforcement. Susan Gibson, who recently retired from DEA as the Special Agent in Charge of the New Jersey Division, "found that men who truly support women in law enforcement are not too common" in her twenty-eight years of experience, but many female agents sought out Dustin for "operational and personal advice on how to navigate the strong and tough New York City law enforcement arena." Ex. 044, Gibson. Women counted on him because he was "always willing to stop what he was doing to take a walk to discuss an issue and

above all was very vocal with his support which is not a common trait." *Id.* Even his women bosses, who sometimes experienced poor treatment from male supervisees, called out his unflinching respect. Sarah Dunlea, currently a Group Supervisor at DEA who has known Dustin for ten years and worked side by side with him for four as a supervisor, calls Dustin an example for "always respect[ing] me as a co-worker, a boss, and a female in law enforcement." Ex. 038, Dunlea.

In this regard, Camille Colon's letter is also very noteworthy. She is one of the oldest members of NYDETF still on duty. Her story—including the obstacles she faced—is compelling. She started as a part-time student at Bronx Community College, raised a child on her own, obtained a Ph.D. from Fordham University, joined DEA after graduation at the age of thirty-two, and has been with DEA for forty-four years since. Ex. 020, Colon. She was the first female group supervisor in the Task Force, which was "no easy task especially because women in federal law enforcement were far and few between." *Id.* Dustin is someone she fondly recalls as one of the few male agents with whom she shared a genuine bond:

> Given that I am older than the grandmothers of some of these newly minted officers, there have been times when I have made requests for information that have gone unanswered or unheeded. Not so with Detective Genco…There was never any second guessing of my input for his cases; he respected my experience as I have respected his. He was oftentimes a conduit between me and other Task Force members, assisting me in getting exactly what I needed…Anyone looking at us would not question the bond we have. I'm 75 years old, with nearly 44 years in DEA, and am viewed as a dinosaur especially in terms of current technology. Dustin never saw the differences, rather he only saw our shared work ethic, the responsibility to help others and the ability to always extend your hand to someone else.

Ex. 020, Colon.

### E.    Dustin Always Conducted Himself with Professionalism and Integrity

Dustin was respected by his co-workers not only because of the work he did, but also because of *how* he did the work. As James Hunt, retired Special Agent in Charge of DEA New

York Field Division and former Chief of NYDETF, puts it: "The words outstanding or excellent would not adequately describe Mr. Genco's performance as a Detective or his character as I know him. Dedicated, brave, honest, decent are words that come to mind." Ex. 056, Hunt. To excerpt a few of the testimonials from the letters of support:

- **Richard Bergin**, a retired Lieutenant with NYPD who used to serve at the Internal Affairs Bureau and worked as the Integrity Control Officer while assigned to NYDETF, has known Dustin for more than fifteen years. He said: "As the Integrity Control Officer, my job was to monitor the Detectives' compliance to established department guidelines and procedures. Over the course of that time, I observed Dustin…display the highest level of integrity and compassion during his investigations." Ex. 010, Bergin.

- **William Walsh**, a retired NYPD Sergeant and an Investigator with the Nassau County DA's Office, in his twenty-five years of knowing and working with Dustin, has "always viewed Detective Genco as being trustworthy and dependable," and writes that "[h]is character has always been above reproach" and his "integrity has never been in question." Ex. 099, Walsh.

- **William Cardona**, a retired NYPD Detective who served for twenty-nine years and has known Dustin for twenty-five, "witnessed firsthand [Dustin's] sense of professional integrity by impeccably handling the details of his cases from reporting, to itemizing property, to follow through until the process was complete." Ex. 016, Cardona.

Dustin's professionalism and integrity were not only shown in his interactions with his peers, but also with drug traffickers, suspects, and those living on the edge of society. Dustin's DEA supervisor Sarah Dunlea recalls how Dustin treated arrestees with respect and compassion:

> Dustin is extremely respectful to the known criminals who were arrested in these Heroin Mills. He would talk to them, and always gave them opportunities to use the phone to call their families prior to going to jail. He truly cared that they were able to do that.

Ex. 038, Dunlea.

In another vignette, retired DEA agent T. Glen Coughlin recalled Dustin's patience and care even when interviewing drug-mills workers:

> Patiently, he sat with each worker letting them write and tell their story as to how they would up bagging drugs for these ruthless cartels. Each worker had a story. Many were unemployed mothers, grandmothers, and fathers. That night,

the mill workers' statements led to the seizure of over a million dollars in US currency at a stash house.

Ex. 024, Coughlin.

Kevin Roy, a retired NYPD Detective after twenty-five years of service, has known Dustin for more than twenty-five years. The one incident remains in this memory after all the years is how a "street kid" thanked Dustin for "turning his life around":

> [A]n individual approached me and asked if he could speak to Detective Genco. …This individual went on to tell me that he had an encounter with Dustin, and he wanted to thank Dustin for saving his life and turning his life around. He went on to tell me that he was running the streets and getting into a lot of trouble. He said that Dustin approached him one day and spoke to him, [saying to] him: ["]What are you doing? These streets ain't for you. Don't put your family through one or two things that will happen to you, jail or death.["] He said no one spoke to him like that before and after that conversation he thought real hard about what Dustin said to him.

Ex. 084, Roy.

### F. Dustin Is Beloved Because of His Humble and Humorous Personality

Behind all the achievements, dedication, and professionalism, at the end of the day, Dustin is just a simple and pleasant guy, who others love:

- Retired prosecutor **Marcel Philippe** describes Dustin as "a sweetheart and professional to work with, not a 'cowboy'" and that his "easy-going personality made him a pleasure to work with," that "he endeared himself through his constant sense of humor," and "[e]very time he was in our office, he was a pleasant, always good-humored, sensitive, and smart DEA agent." Ex. 075, Philippe.

- Former DEA Special Agent for the New York Division **Danielle Dreyer** writes that "Genco possessed an air of humility that I would never have expected from someone so advanced and respected in their career," that "[f]rom helping the new agents with no experience, to treating those he arrested with as much respect as his coworkers, Genco was truly a friend to all," and that "[e]ven his arrestees were oftentimes joking with Genco by the end of the evening." Ex. 037, Dreyer.

- Former colleague **Charles Bernard** writes that Dustin "is not the shy and retiring type, but that does not imply he is boastful," rather, "he has proven to be quite humble, often looking to share the spotlight and accolades of his successes with his teammates." Ex. 011, Bernard.

## IV.    THE ARREST AT ISSUE AND THE FORCE USED

On October 20, 2022, a DEA task force and the United States Marshals Service conducted an arrest of Frandi Ledema, a fugitive drug dealer, at an apartment in the Bronx.  The arrest team was comprised of several officers, but the team deployed at the rear of the building (in case Ledema fled through a window) was short-staffed.  Normally that detail would have at least six officers; it had only three, and one (Deputy Sheriff Brenda Orejuela) stepped away.  So at the time of the arrest, the detail consisted only of Dustin and Special Agent ("SA") Claudia Salvitti.

Dustin and SA Salvitti waited at the back of the building.  Ledema tried to flee from a back window.  He descended from a fire escape, which is where the first clash occurred.  Dustin did not draw his firearm or brandish any weapon.  Instead, standing beneath Ledema (*see* Photo 1), Dustin tried to reason with him and encourage him to surrender peacefully.  While Dustin was talking, Ledema surprised him by jumping on him with full force from his elevated position, and almost knocking Dustin over the railing.  (*See* Photos 2 and 3).  Dustin fell to the floor.  While Dustin picked himself up, Ledema knocked past SA Salvitti on the fire escape (*see* photo 4) and ran down the alley to escape.



(Photo 1)          (Photo 2)          (Photo 3)          (Photo 4)

After running into the alley, Ledema quickly realized it was a dead end and tried to run past Dustin, who tried to pin him against a wall. While trying to escape Dustin, Ledema hit SA Salvitti in the head with his left hand, knocking her across the alleyway. (*See* Photos 5 and 6). Dustin was left alone trying to restrain Ledema, who continued to fight him while SA Salvatti picked herself up. (*See* Photo 7).



(Photo 5)　　　　　　　　　　(Photo 6)　　　　　　　　　　(Photo 7)

They grappled. (*See* Photo 8). They fell. (*See* Photo 9). For a few seconds, the two men rolled on the ground as Ledema continued his effort to escape. (*See* Photo 10).



(Photo 8)　　　　　　　　　　(Photo 9)　　　　　　　　　　(Photo 10)

Finally, SA Salvitti rejoined the fray and tried to pull Ledema off Dustin. (*See* Photo 11). Eventually, Dustin got Ledema on his stomach. (*See* Photo 12). SA Salvitti applied handcuffs and sat Ledema in an upright position. (*See* Photo 13).



(Photo 11)                (Photo 12)                (Photo 13)

At that point, Dustin was exhausted and in pain from his injuries sustained from the struggle. He sustained cuts, bruises, and scrapes all over his body. He stood up to pick up his radio (it was knocked to the ground), intending to call for backup to help further restrain Ledema. When he returned to the seated Ledema, he kicked him in the chest. (*See* Photo 14). Whatever force was used, it did not knock Ledema over. (*See* Photo 15).




(Photo 14)                (Photo 15)

After the arrest, the arrest team took photos of Ledema, who was still shirtless. The pictures show no redness or swelling on or near his chest. (*See* Photo 16). His ornate necklace was not damaged by the kick. (*See* Photo 17). Ledema refused to seek medical treatment. But the prison required medical clearance before taking him in, and Dustin's team separately took him to a hospital for medical examination. On both occasions, Ledema complained of no injury or pain to his chest.


(Photo 16)


(Photo 17)

Following DEA's protocols, Dustin prepared a Report of Investigation (the "DEA-6") after the arrest with descriptions of the arrest. The DEA-6 report was reviewed and approved by Dustin's then-supervisor at DEA, Arthur Tracy. When preparing the report, and in the days that followed, Dustin justified the kick to his colleagues and his boss, saying words to the effect of Ledema was still resisting, Ledema was trying to get up from the ground. Whatever Dustin's memory was, he now agrees that Ledema's actions on the fire escape and in the alley scared and angered him and, after the struggle, he kicked Ledema with frustration.

Dustin has conducted more than 1,500 arrests during his long career. He never had a struggle so intense, nor an experience like Ledema jumping from an elevated fire escape and almost knocking him over. He never before assaulted an arrestee. He is ashamed and embarrassed that he let his emotions cloud his judgment in this instance.

## SENTENCING ANALYSIS

When imposing a sentence, the United States Sentencing Guidelines Manual ("USSG" or the "Guidelines") instructs the court to follow a three-step analysis: first, "[t]he court shall determine the kinds of sentence and the guideline range as set forth in the guidelines" under 18 U.S.C. § 3553(a)(4); second, the court shall calculate any applicable departures from the guideline range authorized by specific policy statements in the USSG under 18 U.S.C. § 3553(a)(5); and third, "[t]he court shall then consider the applicable factors in 18 U.S.C. § 3553(a) taken as a whole" to consider if any variance from the guideline range is warranted. *See* USSG §1B1.1(a)–(c); *see also United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005) (A "sentencing judge must consider the factors set forth in 18 U.S.C. § 3553(a), including the applicable Guideline range and available departure authority. The sentencing judge may then impose either a Guidelines sentence or a non-Guidelines sentence.") (citations omitted).

In other words, although the Guidelines must be consulted, they are merely advisory and are not presumptively reasonable. *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008). Sentencing courts are free to sentence well below the Guidelines, and generally do. Indeed, in 2022, judges in the Southern District of New York imposed within-Guidelines sentences in only 19.1% of cases and below-Guidelines sentences in 79.4% of cases.[9]

Our sentencing analysis below follows the three-step process and shows why the Court should impose a non-incarceratory sentence in this case. In imposing the sentence, we hope the Court will give due consideration to the recommendation of the experienced Probation Officer, Simone Belgrave. After reviewing the circumstances of the case and considering available

---

[9] U.S. Sentencing Commission Statistical Information Packet, Southern District of New York (2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nys22.pdf, at 12.

sentencing options, Officer Belgrave believes that "**a custodial sentence is [not] necessary to achieve the sentencing objectives** outlined in 18 U.S.C. § 3553(a)," and recommended that "a sentence of **Time Served (1 day) followed by one year of supervised release**" be imposed in this case. Presentence Investigation Report ("PSR") at 27-28 (emphasis added). Additionally, the U.S. Probation Office observed that Dustin's "positive adjustment to pretrial supervision and lack of criminal history are suggestive of lower recidivism risk and may warrant a sentence outside of the advisory guideline system." PSR ¶ 95.

## I.    STIPULATED GUIDELINES SENTENCE

Although the Guidelines range is listed as one of the seven factors the Court should consider under § 3553(a)(4), we address it first as the Supreme Court has instructed that "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that "the Guidelines should be the starting point and the initial benchmark" before considering "all of the § 3553(a) factors" to make a sentencing determination. *Gall v. United States*, 552 U.S. 38, 49–50 (2007).

Pursuant to the plea agreement entered between Dustin and the Government (the "Plea Agreement"), the parties stipulated to a total offense level of 17 and Guidelines calculation of 12 months' imprisonment (the "Stipulated Guidelines Sentence"). The U.S. Probation Office calculated the same range (although it recommended a sentence of time served). *See* PSR ¶¶ 32-42.

We do not dispute the Stipulated Guidelines Sentence here. However, we respectfully submit that Dustin's use of force—which occurred after an intense struggle in which he was injured, placed in danger, and had just engaged in a long struggle with a person actively resisting

arrest, and which involved no weapon and caused no material injury[10]—places him well outside the heartland of normal "use of force" cases. The offense level of 17, and even the statutory maximum sentence of one year, overstate the seriousness of Dustin's offense.[11]

## II. DUSTIN'S ABERRANT BEHAVIOR WARRANTS A SENTENCE OUTSIDE THE STIPULATED GUIDELINES RANGE.

The Second Circuit instructs that district courts, in imposing a sentence, "may consider [the defendant's] prior good works and employment record as well as the other factors described in the Application Notes to Section 5K2.20." *United States v. Gonzalez*, 281 F.3d 38, 48 (2d Cir. 2002). Section 5K2.20 of the USSG titled "Aberrant Behavior (Policy Statement)" in turn states that courts may sentence lower when "the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding

---

[10] Defense counsel does not dispute the accounts in the PSR regarding the injuries potentially sustained from the kick. *See* PSR ¶¶ 27-28 ("Victim Impact"). However, it is worth noting that Ledema did not complain about any pain or discomfort caused by the kick on the day of the arrest, and initially refused to go to the hospital. When he was finally taken to the hospital, according to an after-visit summary by New York Presbyterian, Ledema was treated only for "abrasions to both knees and right hand," the diagnosis was "[m]ultiple abrasions," and Ledema "has been evaluated and cleared for any condition requiring further medical management at the time of discharge." Records from the Medical Treatment of Prisoner form corroborate the hospital's conclusions. The form states that the "Nature of Illness/Injury" was "cuts & abrasions," and remarks that "[Ledema] has been evaluated and cleared for any condition requiring further emergency medical management at time of discharge." Additionally, pictures of Ledema taken on the day of the arrest do not show any injuries to his chest.

[11] Additionally, with respect to the two-level enhancement based on "obstruction of justice," the Government has taken the position that Dustin's discussion with Agent Tracy (*see supra* Background § IV) amounts to obstruction. *See* Plea Agreement A.6. Pursuant to the Plea Agreement, we are not disputing, and cannot dispute, the government's calculation. However, we note that several courts have held that the kind of communications that Dustin had with his supervisor were outside the bounds of the conduct intended by the Sentencing Commission when creating the obstruction enhancement. *See United States v. Byors*, 586 F.3d 222, 227 (2d Cir. 2009) (the guideline contains "a temporal element, which requires the obstruction to occur **during** the investigation, prosecution, or sentencing of the offense of conviction") (emphasis added); *United States v. Borker*, 2019 WL 1790054, at *19 (S.D.N.Y.2019) ("As a general matter, 'making false statements, not under oath, to law enforcement officers' does not warrant an obstruction adjustment…") (quoting U.S.S.G. § 3C1.1, cmt. 5(b)); *United States v. Cusack*, 66 F. Supp. 2d 493, 499 (S.D.N.Y. 1999), *aff'd*, 229 F.3d 344 (2d Cir. 2000) (applying Application Note 2 and concluding that "an unsworn denial of guilt—even a false and material unsworn denial—cannot become the predicate for an obstruction of justice adjustment."). Based on these authorities, Dustin's post-offense statements to colleagues and supervisors are at the very edge of the broadest reading of 3C1.1. We respectfully request that the Court consider these authorities in fashioning an appropriate sentence under 18 U.S.C. § 3553(a).

life."  Application Note 3 of Section 5K2.20 provides courts with "Other Circumstances to Consider," including: "the defendant's (A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense."  USSG §5K2.20.

Dustin has arrested many, many individuals.  Never before has he struck any outside of reasonable attempts to subdue.  In every way, Ledema's arrest was unique: a fleeing felon, who refused attempts to "talk him down;" creating a dangerous situation on an elevated fire escape; and an extended grappling match, where both agents on an understaffed detail were injured.  *See supra* Background § IV.  Especially in light of these factors, Dustin's outburst—a single leg strike—is a quintessential "aberrant behavior" in an extraordinary case.

Indeed, the letters submitted to the Court provide overwhelming support that, prior to this incident, Dustin was not only a law-abiding citizen without any criminal record, but also had been conducting himself with an impressive level of professionalism and integrity.  *See supra* Background § III.E.  Jonathan Wilson, a retired DEA agent after thirty-three years of service and supervised Dustin for the last several years, said "I am stunned that Dustin, as the consummate law enforcement professional whom I have come to know, could have committed this act"—"[i]t is complete aberration and wholly inconsistent with the person I know and supervised."  Ex. 100.

## III.  § 3553(a) FACTORS COUNSEL FOR A DOWNWARD VARIANCE

A sentencing judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts," and "should consider all of 18 U.S.C. § 3553(a)'s factors to determine whether they support either party's proposal."  *Gall*, 552 U.S. at 50.

Our sentencing analysis below discusses each of the factors in order.[12]  The § 3553(a) factors, as applied to this case, show that sentencing Dustin to a non-custodial sentence is "sufficient, but not greater than necessary."  §3553(a).

## A.    § 3553(a)(1):  Nature and Circumstances of the Offense

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense.  Nothing herein is intended to minimize the conduct to which Dustin has pleaded guilty, but we believe the underlying circumstances are important for the Court to consider in imposing a sentence.

At the scene of the arrest, Dustin first acted bravely, charging alone up the fire escape to arrest Ledema, sparing his younger and less experienced colleague.  Despite the fact that Ledema's physical positioning put Dustin at risk and gave Ledema a tactical advantage, Dustin did not draw his firearm.  He surely would have been justified in doing so.  He did not brandish any other weapon, including a taser.  He surely would have been justified.  Instead, he calmly entreated Ledema to surrender.  The video clearly shows Dustin trying to reason with Ledema, even motioning with his hands for Ledema to relent and come down.

These are the kinds of choices Dustin has consistently made over the course of his career when he is exercising his normal judgment.  He makes choices to de-escalate even when his own safety would counsel in favor of force.  He makes choices to de-escalate even when other officers would overreact.  At the beginning of the arrest, he chose restraint.

Ledema chose to fight.  He launched a surprise attack, hurling his body down a half-flight of stairs to overwhelm Dustin, which nearly knocked him over the railing.  A grueling arrest

---

[12] Except for § 3553(a)(4) (guideline range), which has been discussed in *supra* Analysis § I, §3553(a)(5) (policy statements within the USSG), discussed in *supra* Analysis § II, and §3553(a)(7) ("the need to provide restitution to any victims of the offense"), which does not apply here.

ensued, where Dustin was forced to battle Ledema alone, especially after Ledema knocked Claudia Salvitti across the alleyway.  By the time of the kick, Dustin's judgment was impaired: he was exhausted, rattled, fearful, out of breath, and not thinking clearly.  Uncharacteristically, he lost his temper.  Kicking Ledema was inappropriate, but the force was obviously minimal—since Ledema remained seated upright and complained of no pain or injury to his chest during the medical examinations after the arrest on the same day.

At bottom, as Dustin stated in his allocution to this Court, he never meant to injure Ledema, and at that moment, he was "rattled," "exhausted," "out of breath," and acted impulsively.  PSR ¶ 31.  After the arrest, Dustin and his team repeatedly asked Ledema if he wanted to go to the hospital.  Ledema repeatedly responded that he needed no medical attention, but Dustin instructed his team to take him to the hospital anyway.  The attending physician did a thorough examination and found no injuries caused by the kick, despite Ledema's later complaints.

Therefore, we respectfully submit that a custodial sentence would punish Dustin more than is necessary or commensurate with the nature or circumstances of the offense.  As discussed below, other cases of excessive force have resulted in many declined or deferred prosecutions, and many others have led to non-incarceratory sentences.  *See infra* Analysis § III.E.  As much as the current political climate has justifiably called for more accountability for officer misconduct, a prison sentence is not merited by the facts of *this* case, even putting aside Dustin's storied career.

B.     § 3553(a)(1):  History and Characteristics of Dustin

Under Section 3553(a)(1), the Court must also consider Dustin's specific history and personal characteristics.

Dustin grew up in a broken family, followed by a stable but humble upbringing.  He then made a life for himself, one devoted to public service.  The avalanche of support for Dustin, as evident by the 101 letters submitted to this Court and the presence of his former colleagues who

packed the courtroom and overflowed into the hallway on the day of the Plea Hearing, speaks volumes as to what kind of person Dustin is—a selfless and hardworking man, who is always trying to do good, truly cares about the people around him, tries to take care of them to the best of his ability, and saved countless lives by putting his own on the line.

As Dustin's wife writes: "My husband became a hero on February 28, 1994 [when he joined the NYPD], and will be a hero until he takes his last breath. It's just who he is. Always ready to help anyone in need and a person that you can always count on." Ex. 042, Fran Genco. "Hero" is a loaded word, but Dustin's wife is not the only person who sees him that way. *See* Ex. 031, P. Daly (former colleague at NYPD and worked alongside Dustin since the 9/11 rescue efforts) ("No matter what happens, Dustin Genco will continue to be a hero to many of us."); Ex. 049, Gyenes (retired Supervisory Special Agent from DEA who has known Dustin for fifteen years) ("Dustin is a true American Hero and a great friend."). Multiple people who have worked alongside him describe Dustin as a person with whom they could trust their families' and their own lives, which demonstrates trust and respect in the highest possible form. *See* Ex. 048, Grogan ("if anything 'God forbid' were to ever happen to me or a family member, that required an investigation, I'd want him working on the case"); Ex. 044, Gibson ("[y]ou would want Genco standing in front of you and investigating the disappearance of your loved one").

Moreover, Dustin is a committed family man, which this Court may consider when deciding Dustin's sentence. *See United States v. Davis*, No. 07-CR-727, 2008 WL 2329290, at *5 (S.D.N.Y. June 5, 2008). In *Davis*, the court found that any custodial sentence would "halt [defendant]'s significant positive impact on his children's life," and "would be disastrous to [his] family." *Id.* at *5. So too here. Dustin is the primary earner of his family. After he resigned from law enforcement, he had to take another job as an operations manager for Global Security Solutions

so he could keep providing for his family, including by making sure his two children could complete their college education. Additionally, Dustin's children are still in their formative years, and Dustin never ceases to be their role model with "significant positive impact on his children's life" despite this one mistake made by their father:

> No matter what happens, I know who my father is at heart…Nothing will ever take away how proud I am to be Dustin Genco's daughter.

Ex. 043, Francesca Genco.

> I am grateful for everything he has done for me, my feelings for him will remain unwavering, no matter the circumstances.

Ex. 041, Dustin Genco (Jr.).

### C. § 3553(a)(2): A Noncustodial Sentence Satisfies the Sentencing Goals of Retribution, Deterrence, Incapacitation, and Rehabilitation

Section 3553(a)(2) requires a sentencing court to consider the need for the sentence imposed (A) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (B) "to afford adequate deterrence to criminal conduct," (C) "to protect the public from further crimes of the defendant," and (D) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Tapia v. United States*, 564 U.S. 319, 325 (2011) (citing 18 U.S.C. § 3553(a)(2) factors and summarizing these considerations as "**retribution, deterrence, incapacitation, and rehabilitation**"). As set forth below, we respectfully submit that a non-incarceratory sentence would be sufficient to accomplish these goals, and a custodial sentence would be more than necessary.

#### a. Retribution: A Prison Term is Not Necessary to Adequately Reflect the Seriousness of the Offense, to Promote Respect for the Law, or to Provide Just Punishment

Dustin has already been punished for his actions. After the incident, he was first put on desk duty, and ultimately forced to resign from Nassau County DA's Office. He has also forgone

the opportunity to ever work as a law enforcement officer. His wife describes the heartbreaking moment when Dustin had to resign from law enforcement:

> In all the years of being in the law enforcement, the hardest day was when he was stripped of his DEA credentials. I've never seen or heard my husband sob as he did that day. He was broken. Now it was me holding him as he was lying on the floor feeling lost and repeatedly apologizing…I know this moment will haunt my husband for the rest of his life. He misses his job more than anything. This has been one of the worst years of our lives. He is not the same. He is sorry, devastated, and remorseful. He sees what this has done to all of us…We teach our children—a mistake can become a lesson as long as we learn from it.

Ex. 042, Fran Genco.

Additionally, in imposing "just punishment" for a particular offense, "a sentencing judge cannot ignore the additional penalties and hardships that will attach as a result of conviction." *United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014) (citations omitted). As stated above, Dustion is the primary earner of his family. Without Dustin's income, Fran, who works as an academic intervention services (AIS) teacher, would not be able to cover, by her own meager, part-time salary, all household bills, and more importantly, the remaining college tuition for their two kids. An incarceratory sentence is not only unnecessary, but would undoubtedly be catastrophic for Dustin's family.

### b.  Deterrence: A Noncustodial Sentence Affords Adequate General and Specific Deterrence

Section 3553(a)(2)(B) requires the Court to consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct," that is, to promote general and specific deterrence. We respectfully submit that the loss of Dustin's life-long career and sterling reputation, the shame, anxiety, and depression that Dustin has already suffered, and the turmoil caused in his and his family's life by this case have already provided adequate specific and general deterrence.

In terms of general deterrence, courts in the Second Circuit have found that "interests of general deterrence [can be] adequately served without imposing a prison sentence." *United States v. Hawkins*, 380 F. Supp. 2d 143, 177 (E.D.N.Y 2005); *see also United States v. Discenza*, 2016 WL 3443586, at *2 (S.D.N.Y. May 31, 2016) (noting "probation both reflects the seriousness of the offense and promotes general deterrence while accounting for [defendant]'s history of providing valuable medical services"). More importantly, a custodial sentence is not necessary to achieve general deterrence. Dustin has already been punished in various ways, including the damage to his reputation, permanently losing his career as a law enforcement officer, and having endured a high-profile guilty plea and sentencing.[13]

The message of this prosecution is already resonating through law enforcement: even if a single inappropriate blow is used, and even if it causes no material injury, officers now stand open to federal prosecution for excessive force. As discussed below, many, many other acts of excessive force have gone unpunished altogether by federal and state authorities. *See infra* Analysis § III.E. We suspect that making sure law enforcement better trains officers to resist even momentary lapses of judgment during times of high stress was a central consideration to the government in bringing this prosecution. It achieved that goal.

In terms of specific deterrence, it is clear from the letters of people who have known Dustin for decades that the instant offense was aberrational, and he knows and lives with the severe consequences of his poor judgement. *See supra* Background § III.E, Analysis § III.C.A. Because Dustin has resigned, there is no need to incarcerate him in the interests of specific deterrence. By

---

[13] *See* news coverage of Dustin's sentencing, *e.g.*, U.S. Attorney's Office, *Former DEA Task Force Officer Pleads Guilty To Unlawfully Assaulting Individual During Arrest* (August 2, 2023), https://www.justice.gov/usao-sdny/pr/former-dea-task-force-officer-pleads-guilty-unlawfully-assaulting-individual-during; Michael O'Keeffe, *Ex-investigator for Nassau DA pleads guilty to striking suspect in handcuffs*, Newsday (August 4, 2023), https://www.newsday.com/long-island/crime/dustin-genco-investigator-nassau-da-assault-suspect-my9lw80l; Matthew Russell Lee, *For Kicking Cuffed Prisoner in Chest Dustin Genco Takes Misdemeanor Plea, Keeps Guns*, Inner City Press, https://www.innercitypress.com/sdny1subramaniangencoicp080223.html.

definition, Dustin's promise in the plea agreement never to seek a law enforcement position in the future, *see* Plea Agreement at 2, means this incident can never re-occur.

Specific and general deterrence require no sentence of incarceration.

### c. Incapacitation: the Public Does Not Need Protection from Dustin

Dustin has devoted his whole career to protecting the public. A non-incarceratory sentence will not harm the public; on the contrary, it would allow Dustin to keep serving the people around him, even if it is no longer in the capacity of a law enforcement officer. *United States v. Collado*, No. 07-CR-1144, 2008 WL 2329275, at *6 (S.D.N.Y. June 5, 2008) (noting "community would be better served by having [the defendant] in it and available to provide substance abuse treatment to others"). Dustin's family and community clearly need him. Other than this offense, he has been a shining example to both, as all the letters attest.

### d. Rehabilitation: Dustin Suffers from Health Conditions Requiring Routine Medical Care

Pursuant to Section 3553(a)(2)(D), the Court must consider the need for the sentence "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Obviously, Dustin does not need other forms of training or treatment. But his need for medical care will not be served in prison. Dustin suffers from coronary artery disease, which requires routine visits to his cardiologist to monitor its development so the doctor can make interventions when the situation worsens. *See* PSR ¶ 61. An incarceratory sentence increases the risk of delay in treatment, and we request the Court to take Dustin's health conditions into consideration when imposing the sentence.

### D. § 3553(a)(3): The Kinds of Sentences Available

An incarceratory sentence is not an appropriate means of effective correction here. The instant offense is "an isolated incident of extremely poor judgment." PSR at 27. Dustin was a

law-abiding citizen before the offense, and after his plea has gone above and beyond to comply with his bail conditions, including by reporting regularly and removing the weapons from his residence.  *See* PSR ¶ 5.  The U.S. Probation Office observes that Dustin demonstrates "lower recidivism risk" based on his "positive adjustment to pretrial supervision" and lack of prior criminal history.  *Id.* ¶ 95.  A non-incarceratory sentence would allow Dustin to continue utilizing his skills and advancing his career with little risk or downside.

Moreover, sending Dustin to prison would entail a huge risk of physical harm.  Dustin was a prolific law enforcement officer, whose decades of work had sent countless drug dealers, many of whom were members of large cartels, to prisons in the New York area.  A prison sentence thus poses a potential danger to Dustin's safety.  He would be in danger if he was put in the "general population."  Moreover, he would likely be required to serve any sentence, given the limited duration, in a local jail.[14]  As a result, he would probably be placed in solitary confinement during any sentence.  Obviously, solitary confinement is an extremely taxing and unfair form of punishment, but it may be the only way to keep Dustin safe in any prison.[15]

To put it in more specific terms, as an active and productive officer for three decades, Dustin participated in more than 1,500 arrests in his career.  Sending Dustin to prison means Dustin might be incarcerated with many of the people he personally arrested.  Richard Preiss, who served as prosecutor in the Office of the District Attorney of New York County for over thirty years, believes that "former police officers sentenced to prison are always at risk."  Ex. 078, Preiss.  This

---

[14] *See* Bureau of Justice Statistics, *Correctional Institutions*, https://bjs.ojp.gov/topics/corrections/correctional-institutions (describing persons confined in a jail facility, operated by local law enforcement authorities, are usually sentenced to an incarceration sentence of one year or less, whereas persons confined in prisons, usually operated under the authority of a state Department of Corrections or the Federal Bureau of Prisons, are typically serving an incarceration sentence of more than one year).

[15] Jamal Andress, *Protecting Ex-Officers From Becoming Targets While Serving Prison Time*, SCRIPPS NEWS (May 18, 2022), https://scrippsnews.com/stories/protection-for-ex-officers-in-prison/ (describing the risks of putting former police officers behind bars, and solitary confinement as part of a program that keeps high-profile inmates like former police officers safe).

heightened risk means that a custodial sentence would be a much more significant punishment for Dustin than for an ordinary defendant, and would thus punish Dustin more than is necessary to achieve the objectives of sentencing.

### E. § 3553(a)(6): A Shorter Sentence is Necessary to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) mandates that a sentencing court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A significant and incarceratory sentence in Dustin's case will create disparities at every level of the criminal justice system, including courts in the Second Circuit, federal courts in general, and state and local courts across the nation.

*First*, officers across the nation who committed more serious constitutional violations routinely face no prosecution at all or, if convicted, receive no jail time.

In New York, cases where law enforcement officers committed more serious force offenses but did not receive any incarceratory sentence frequently made headlines.

For example, a former NYPD officer, who was convicted by jury of manslaughter and official misconduct in the shooting death of an unarmed black man in 2014, was sentenced to five years of probation and community service and **no jail time**.[16] The judge remarked that "given how remorseful [the defendant] is," "it would not be necessary to incarcerate the defendant to have a just sentence in this case." *Id.*

In another case, a correction officer at Rikers Island admitted to sexual assault of a female but received **no jail time** after taking a plea.[17] There, the defendant forced the victim into a storage

---

[16] Weston Phippen, *Sentencing for Peter Liang*, The Atlantic (April 19, 2016), https://www.theatlantic.com/national/archive/2016/04/peter-liang-sentenced/478248/.

[17] Lauren von Bernuth, Citizen Truth, *Corrections Officer Admits to Sexual Assault Gets No Jail Time* (June 21, 2017), https://citizentruth.org/corrections-officer-admits-sexual-assault-gets-no-jail-time/.

closet so as to be out of view of security cameras and had oral sex with the inmate.  *Id*.  Instead of jail time, the defendant lost his job and would be on probation for ten years.  *Id*.

Additionally, a former Rochester police officer was sentenced to **three years of probation** after he was convicted of assault.[18]  There, the defendant and his partner had wrongly identified the victim as a burglary suspect and beat him, causing a fracture on the victim's face.  *Id*.  In rendering the sentence, the judge observed that "part of the reason for what happened was a result of the PTSD from [the officer's] years of service," and urged the police department "to develop programs that would allow officers to seek help dealing with the trauma they experience on the job."  *Id.*

In another case, a police officer in Utica, New York, who pled guilty of using excessive force, received **two years of probation**.[19]  There, "[t]he arrestee was handcuffed behind his back and in leg shackles," and "[o]nce the arrestee was lying on the floor of the van face up and restrained, [the officer] kicked him *several times* in the face and upper chest while wearing work boots," causing "the arrestee pain and a bruised and swollen lip."  *Id*. (emphasis added).

The situation is no different outside of New York.

A former police officer in Kentucky, who pleaded guilty to one count of misdemeanor for using unreasonable force, was sentenced to **two years of probation**, 200 hours of community service, and a $5,000 fine because the officer "shot an individual with a pepperball even though

---

[18] Gary Craig, Sean Lahman, Democrat and Chronicle, *Former RPD officer Michael Sippel sentenced to 3 years probation for assault of city man,* (September 16, 2019), https://www.democratandchronicle.com/story/news/2019/09/16/michael-sippel-sentenced-for-assault-of-christopher-pate-rochester-ny-police-officer/2272311001/.

[19] United States Attorney's Office, Northern District of New York, Former Utica Police Officer Sentenced for Using Excessive Force (July 21, 2022), https://www.justice.gov/usao-ndny/pr/former-utica-police-officer-sentenced-using-excessive-force.

the individual was standing on private property and not posing a threat to the defendant or others."[20]

In another case, A former Idaho Springs police officer was sentenced to **two years' probation**, 120 days of ankle monitoring, 150 hours of community service and anger management classes for tasing a seventy-five-year-old man in the victim's own apartment.[21]  Following the incident, the victim suffered a stroke, which resulted in serious brain injuries, needing around-the-clock care.  *Id*.

*Moreover*, offenses that present outrageous violations of constitutional rights that in no way resemble Dustin's offense received lower sentences than the Stipulated Guidelines Sentence.

A former federal correctional officer was sentenced to **three months in prison** followed by five years of supervised release for "repeated" sexual abuse of an individual in federal custody.[22]  In that case, the officer engaged in repeated sexual acts with an inmate in his care while employed as a sports specialist for the Bureau of Prisons at the Federal Correctional Institution in Tallahassee, and the investigation against him ensued only after the victim finally mustered the courage to come forward to report him.  *Id*.

In *United States of America v. Jeffrey Green*, the defendant was a correction officer who sexually harassed an inmate, pled guilty to one count of misdemeanor violating 18 U.S.C. § 242, and was **sentenced to nine months in prison** and one year of supervised release.  No. 7:17-CR-

---

[20] United States Attorney's Office, Western District of Kentucky, *Former Louisville, Kentucky, Police Officer Sentenced for Using Excessive Force* (January 30, 2023), https://www.justice.gov/usao-wdky/pr/former-louisville-kentucky-police-officer-sentenced-using-excessive-force-0.

[21] *No Jail Time For Former Idaho Springs Officer Nicholas Hanning Who Tased Unarmed 75-Year-Old*, CBS Colorado (January 27, 2022), https://www.cbsnews.com/colorado/news/nicholas-hanning-sentenced-no-jail-time-former-idaho-springs-police-officer-tased-colorado/.

[22] U.S. Department of Justice Office of Public Affairs, *Former Federal Correctional Officer Sentenced to Prison for Sexual Abuse of an Inmate* (August 24, 2023), https://www.justice.gov/opa/pr/former-federal-correctional-officer-sentenced-prison-sexual-abuse-inmate.

263, Dkt.19 (October 20, 2017, S.D.N.Y).[23]  There, the defendant "unlocked and opened Victim-1's cell and entered it alone," "grabbed Victim-1 by her arms, held her against the wall of her cell, licked and kissed her neck, and fondled her breasts"; after Victim-1 "pushed [the defendant] away, he again grabbed her, pushed her against the wall of her cell, pulled up her shirt and bra and licked and kissed her neck, chest, and breasts"; the defendant only stopped and left Victim-1's cell when he was interrupted by the arrival of another correction officer.[24]

It is also important to note that in that case, the Guidelines sentencing range applicable to the defendant's Section 242 violation was 18 to 24 months' imprisonment.  *Jeffrey Green*, No. 7:17-CR-263, Dkt.17 (August 8, 2017).  The Government stated that they "believe[] the facts in this case could have supported a felony prosecution," *id.*, Dkt.13 (July 24, 2017), but entered a plea agreement of misdemeanor with a stipulated Guidelines sentence of one year, *id.*, Dkt.17 (August 8, 2017).  The final sentence imposed by the court was lower still—nine months, below the statutory maximum of one year.

The offense there was repulsive, intentional, and involved repeated actions—none of these elements are present in Dustin's case—but the court there still showed leniency.  Dustin deserves more leniency.  To sentence Dustin to jail would be a grossly disparate compared to other cases of officer misconduct, even within the Southern District itself.   Two cases bear specific mention.

First, a former NYPD officer was sentenced to one year in jail after forcing a woman to perform sex acts.  *See Castilla v. City of New York*, 2012 WL 5510910, at *2 (S.D.N.Y. 2012).  The officer arrested the victim and her boyfriend on drug charges.  Among other atrocities, the

---

[23] *See also* United States Attorney's Office Southern District of New York, *Former Correction Officer Sentenced To 9 Months In Prison For Violating Inmate's Civil Rights Through Abusive Sexual Contact* (August 15, 2017), https://www.justice.gov/usao-sdny/pr/former-correction-officer-sentenced-9-months-prison-violating-inmate-s-civil-rights.
[24] *See supra* fn.23.

officer "threatened [the victim] with the removal of her children by the City's Administration for Children's Services…if she did not agree to have sex with him." *Id*. at *1. He then kept her in a bathroom and forced her to perform oral sex. *Id.* at *1-2. To make it even worse, the officer was a recidivist, having done the same thing to another victim. *Id.* at *1, n.3, *2.

Second, another officer was sentenced to one year in prison after viciously attacking a disabled veteran in a hospital, causing him severe injuries. *United States v. Kaim*, 2018 WL 10290286, at *4 (S.D. Ind. 2018). There, among other atrocities, the officer knocked the patient down and punched his head six-to-seven times, causing severe injuries that required extensive treatment. *Id.* at *3.

Dustin's offense in no way resembles these atrocities. Given the surrounding circumstances and the complete absence of any material injury in this case, it would be patently unfair to sentence Dustin to jail in light of the sentences in these horrific cases.

## IV. DUSTIN ACCEPTS RESPONSIBILITY AND IS IMMENSELY REMORSEFUL FOR HIS ACTIONS

Dustin has accepted responsibility and expressed deep remorse both by words and through actions. As he allocuted to this Court, "[k]icking him was wrong, it was unnecessary, and I'm sorry I did it. It took all of a second, and I wish I could take that second back." PSR ¶ 31. After entering into the guilty plea, Dustin promptly resigned from law enforcement in compliance with the Plea Agreement. He also voluntarily surrendered himself and cooperated fully with the Pretrial Services during his bail, including by reporting regularly and removing all firearms from his household before the officers inspected his home, as ordered by this Court. *See* PSR ¶ 5.

Dustin has been under tremendous stress since the arrest in October 2022, and has been "reliv[ing] that moment [of the kick] every day." Ex. 042, Fran Genco. He spends hours on end replaying that arrest in his head over and over again and questioning his years of professional

judgement to the point it became debilitating. During the Plea Hearing, Dustin allocuted to his offense in a quavering voice, wishing he "could take that second back." PSR ¶ 31. As counsel submitted during the hearing, the tears were genuine, and the lessons have been carved into the deepest levels of his psyche.

Family friend Paul Daly (also a NYPD police officer), held their hands during this the plea process, and describes Dustin's conviction behind his decision to plead guilty:

> Dustin explained that his actions, whether they constituted a crime in the penal law or not, were wrong and that this was not a victimless episode…He insisted that he could not look into his children's eyes if he did not admit his mistake and face whatever consequences would follow. Dustin sat down with his children and explained that he believes in the justice system strongly and dedicated his entire adult life to enforce that belief.

Ex. 031, P. Daly.

We respectfully ask this Court in rendering the sentencing decision to show Dustin the same grace that he has given others his whole life and ensure the justice that Dustin has devoted his entire career to advance.

## **CONCLUSION**

For the foregoing reasons, the Court should impose a non-incarceratory sentence.[25]

---

[25] In its Sentencing Recommendation, the U.S. Probation Office included a "Standard Condition": "You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers)." PSR at 30. We respectfully submit that this standard condition should not be applied to Dustin, not only because he is not convicted of any felony, but also because depriving him of the right to own firearms would effectively end his livelihood as an operations manager in a security company where he is currently employed after having to permanently resign from law enforcement pursuant to the Plea Agreement. As an operations manager, the ability to use firearms is an essential part of the job descriptions, and a gun license is critical for Dustin to maintain his employment. And, obviously, his offense did not involve misuse of any firearm.

Dated:   New York, NY  
          February 12, 2024

Respectfully submitted,

**WALDEN MACHT & HARAN LLP**

By:   */s/ Jim Walden*

Jim Walden  
250 Vesey Street, 27th Floor  
New York, NY 10281  
Tel: (212) 335-2030  
jwalden@wmhlaw.com

*Attorney for Defendant Dustin Genco*